**EXHIBIT 5**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ROSEMARY CLAUS SULLIVAN,         ) | |
|                                  ) | |
|       Plaintiff,                 ) | |
|                                  ) | |
| v.                               ) | CIVIL ACTION NUMBER |
|                                  ) |   1:14-cv-00349-LY |
| THE CITY OF ROUND ROCK,          ) | |
| TEXAS; OFFICERS N.J.             ) |    JURY DEMANDED |
| ZOSS, K.A. MAYO, AND A.P.        ) | |
| BALLEW; AND RCI                  ) | |
| HOSPITALITY HOLDINGS,            ) | |
| INC. F/K/A RICK'S CABARET        ) | |
| INTERNATIONAL, INC.,             ) | |
|                                  ) | |
|       Defendants.                ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                 ORAL AND VIDEOTAPED DEPOSITION OF
                         SGT. NATHAN ZOSS
                          APRIL 29, 2015
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     ORAL AND VIDEOTAPED DEPOSITION OF SGT. NATHAN ZOSS,
produced as a witness at the instance of the PLAINTIFF
and duly sworn, was taken in the above-styled and
numbered cause on the 29th day of April, 2015, from
9:38 a.m. to 11:01 a.m. before TEENA L. HARMON-DAVIS,
a Certified Shorthand Reporter in and for the State of
Texas, reported by machine shorthand at Chase Bank
Building, Lonestar Room, 221 West Sixth Street, Austin,
Texas, pursuant to the Federal Rules of Civil Procedure
and/or the provisions stated on the record or attached
hereto.

18

1  supposed to assign the -- the best, closest units, but
2  they do that with patrol units and not necessarily
3  supervisory units.  So what should happen, my
4  understanding of it, how the dispatchers work it, is the
5  two units that show up closest on GPS or three units or
6  four or however many they decide they need for a call
7  will -- it will attempt or want to assign it to that, and
8  the dispatchers do whatever software stuff they have to,
9  to do that, and then it dispatches it to those officers.
10       Q.   If I heard you correctly, you say the appeal
11 went to the best, closest units?
12       A.   In theory.  If the software did its job
13 correctly that's what happened.
14       Q.   What's meant by the term best?  What do you
15 mean by that?
16       A.   Well, one of the dispatchers tried to explain
17 it to me that in theory the system will go, if an officer
18 took, like, eight reports that night and there's another
19 officer who's the same distance away and only took one
20 report, it'll send the officer who took one report.  But
21 I don't think it works that way.  It's supposed to,
22 but --
23       Q.   Do you know why it doesn't work that way?
24       A.   Software stuff.  Beyond my purview.
25       Q.   Okay.  Do you know who was the operator working

SGT. NATHAN ZOSS                                              4/29/2015

**EXHIBIT 5**

21

1      A.     No.
2      Q.     Didn't notice anything on the rearview mirror?
3      A.     No, I did not.
4      Q.     Did you ever notice anything on the rearview
5  mirror?
6      A.     I only noticed it well after the fact, after
7  I read the -- read it in the initial complaint.
8      Q.     And what was that?
9      A.     That there was a handicapped placard there.
10     Q.     Was it in a place you couldn't view it?
11     A.     No, it just wasn't -- I wasn't looking for it.
12     Q.     Did you ever ask Mr. Sullivan if he had any
13 physical disabilities?
14     A.     No.
15     Q.     Did it ever occur to you that he might have a
16 physical disability?
17     A.     Not until he mentioned it.
18     Q.     When did he mention it?
19     A.     He mentioned that he had had a back injury.
20     Q.     When did he mention that?
21     A.     After we'd handcuffed him.
22     Q.     And what was his position at that time?
23     A.     He was laying on the ground.
24     Q.     All right.  How did he get on the ground?
25     A.     He got on the ground because he refused to exit

**EXHIBIT 5**

22

1  the vehicle, and Officer Mayo attempted to use an arm bar
2  takedown to get him out of the vehicle, and when that
3  failed I assisted her doing a double arm bar takedown
4  where we both took control of one of his arms and pulled
5  him out of the vehicle.
6        Q.   What's an arm bar maneuver?
7        A.   Well, it's locking out the elbow, mechanically
8  locking out the elbow, but not in a way that you're
9  torquing it or anything like that, so that the -- so that
10 you have control of the person's arm and their upper arm,
11 and from there you take someone to the ground.
12       Q.   Did Mr. Sullivan ever exhibit any indication
13 that he might have a weapon about him?
14       A.   Well, he refused to comply with any of the
15 commands we gave him.  And I guess we're kind of skipping
16 ahead here.  But he refused to comply with any of the
17 commands we gave him, and at one point in time he -- his
18 hands went out of view when he was being given commands
19 to not do that.
20       Q.   Did you ever pull your weapon?
21       A.   Yes, I did.
22       Q.   And at what point did you pull your weapon?
23       A.   Well, after Officer Ballew approached and
24 Officer Ballew had his weapon out, which is part of the
25 tactic on doing a vehicle extraction for somebody who

**EXHIBIT 5**

23

1  doesn't want to exit a vehicle when they're under arrest,
2  and -- and Mr. Sullivan -- his hands dropped out of view,
3  so I went ahead and presented my weapon at that point.
4        Q.    What was your weapon?
5        A.    It's a department-issued GLOCK 17.
6        Q.    How long did you have your weapon in your hand
7  pointed towards Mr. Sullivan?
8        A.    I don't think it was that long.  You know, I --
9  I don't know the exact time frame.  I'm sure less than a
10 minute, probably even significantly less than that.
11       Q.    Had you ever had any prior acquaintance with or
12 knowledge of Mr. Sullivan?
13       A.    No.
14       Q.    When you received the call from -- is it the
15 police operator?  Is that a fair way to say it?
16       A.    Uh, yes, the --
17       Q.    Okay.  When you received the call from the
18 police operator what specifically was related to --
19 relayed to you?
20       A.    I don't remember specifically.  I think --
21 generally I think the -- I think the radio call went out
22 saying that there is an intoxicated patron trying to
23 leave -- trying to leave in a vehicle with a description
24 of the vehicle.  I'm pretty sure that's what it was.
25       Q.    Yeah.  All right.  Now I want to go back to

**EXHIBIT 5**

35

1  potential situation where she could have been hurt if
2  Mr. Sullivan had tried to drive off, and when we do our
3  reviews on those sort of things we look for issues like
4  that because we always want to make our performance
5  better.
6       Q.   Did anybody, anybody connected with Round Rock
7  Police Department have any other criticism or critique or
8  observation about the process of bringing Mr. Sullivan
9  into submission and --
10      A.   That -- that's the only one that I have
11 knowledge of, and that's because it was -- it was entered
12 in the -- it was entered in the review section on there
13 on the IA module, but that's the only one I'm aware of
14 and -- and in fact, you know, when -- when we got our --
15 I think verbally, I think when the commander talked to us
16 about it, told us it was completely within policy and
17 training and within or tactics training and procedures.
18 It was -- when they reviewed the incident it was -- it
19 was pretty much a nothing deal for them.  You know,
20 they -- you know, this was prior to the lawsuit, but it
21 was -- it was extremely routine and found to be well
22 within our tactics and our training.
23      Q.   Who was the officer or person that made that
24 comment?
25      A.   That was going to be -- well, I believe

**EXHIBIT 5**

44

1    A.   As far as escalation, I don't know that things
2 necessarily escalated.  We used one of the lower levels
3 of force, you know, empty hand control.  I don't know
4 that that was necessarily an escalation.  It was a -- it
5 was an objectively reasonable response to his unlawful
6 aggression -- or resistance.
7    Q.   Did you use the term, his unlawful resistance?
8    A.   Unlawful resistance, yes.  He was -- he was
9 under arrest at that point and it had been explained to
10 him.
11    Q.   Did you ever at any time fear for your own
12 safety in this entire process?
13    A.   Specifically, no.  No, I -- I never felt that
14 there was a direct threat to my life or to my safety.
15 Apparently I didn't -- didn't catch everything as a --
16 but no, there was no direct threat to my life or safety
17 there that I was aware of at the time.
18    Q.   Then can you explain in a little bit more
19 detail why you pulled your gun and aimed it at
20 Mr. Sullivan?
21    A.   Well, absolutely.  Number one, while that is
22 part of the tactic on doing vehicle extractions on
23 someone who refuses to exit a vehicle, the other issue
24 was is that his hands went out of view and he wasn't --
25 he wasn't following any of the commands I'd given him,

EXHIBIT 5

45

1  and they were all lawful and fairly reasonable things,
2  and when his hands went out of view I didn't know if he
3  was attempting to access a weapon or not, so having a
4  weapon at the ready and -- and being prepared to act if
5  a deadly threat appeared is -- is -- is a reasonable
6  thing and it's something we expect our officers to do.
7       Q.   Was there anything other than the fact that his
8  hands were not visible for a period of time that
9  justified using -- pulling a gun on him?
10      A.   Well, that and the fact that he was in a -- he
11 was in a -- in control of a -- of an extremely deadly
12 weapon, you know, a weapon that weighed several thousand
13 pounds, and that truck was big enough that it could have
14 potentially rammed its way out.
15      Q.   You're telling us that the vehicle itself was
16 a weapon?
17      A.   The vehicle had the potential to be a weapon,
18 and us being prepared for eventualities is part of our
19 job.  Or probabilities.
20      Q.   Okay.  Did you personally ever move
21 Mr. Sullivan or any part of Mr. Sullivan's anatomy while
22 he was on the ground?
23      A.   Well, I moved his left arm to handcuff it,
24 left -- left, and I think we tried to sit him up in a
25 recovery position.  He didn't want to move or work with

**EXHIBIT 5**

```
                                                               70
 1         IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION

 3  ROSEMARY CLAUS SULLIVAN,      )
                                  )
 4         Plaintiff,             )
                                  ) CIVIL ACTION NUMBER
 5  v.                            )   A:14-cv-00349-LY
                                  )
 6  THE CITY OF ROUND ROCK, TEXAS;)   JURY DEMANDED
    OFFICERS N.J. ZOSS, K.A. MAYO,)
 7  AND A.P. BALLEW; AND RCI      )
    HOSPITALITY HOLDINGS, INC.,   )
 8  F/K/A RICK'S CABARET          )
    INTERNATIONAL, INC.,          )
 9                                )
           Defendants.            )
10
                 REPORTER'S CERTIFICATION
11          DEPOSITION OF SERGEANT NATHAN ZOSS
                    APRIL 29, 2015
12

13     I, TEENA L. HARMON-DAVIS, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify to
15  the following:
16     That the witness, SERGEANT NATHAN ZOSS, was duly
17  sworn by me and that this transcript of the oral
18  deposition is a true record of the proceedings held and
19  the testimony given by the witness;
20     That the original transcript, along with any
21  exhibits marked therein, was submitted on
22  _____ to _____ for
23  examination and signature by the witness;
24     That pursuant to information given to the deposition
25  officer at the time said testimony was taken, the
```

**EXHIBIT 5**

71

1  following includes counsel for all parties of record:
2          Mr. Broadus A. Spivey, Attorney for the Plaintiff
           Mr. Archie Carl Pierce and Mr. Mike Thompson, Jr.,
3              Attorney for the Defendant Officers and City
               of Round Rock, Texas
4          Ms. Stephanie Roark, Attorney for Defendant RCI
               Holdings, Inc.;
5
           That the amount of time used by each party at the
6  deposition is as follows:
7
           Mr. Spivey - 1 hour:04 minutes
8          Ms. Roark - 0 hours:19 minutes
           Mr. Thompson - 0 hours:00 minutes
9
10         That $_____ is the charge to the Plaintiff for
11 preparing the original deposition transcript and any
12 copies of exhibits.
13         I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties or
15 attorneys in the action in which this proceeding was
16 taken, and further that I am not financially or otherwise
17 interested in the outcome of the action.
18         Certified to by me this _____ day of _____,
19 2015.
20
21                         _____
                           TEENA L. HARMON-DAVIS
22                         Texas CSR No. 4900
                           Expiration Date:  12/31/2016
23                         U.S. LEGAL SUPPORT, INC.
                           Texas Firm Registration No. 341
24                         701 Brazos, Suite 380
                           Austin, Texas  78701
25                         (512) 292-4249 or (800) 734-4995